# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 18, 2012          Decided December 4, 2012

No. 11-1280

KLB INDUSTRIES, INC., DOING BUSINESS AS NATIONAL
EXTRUSION AND MANUFACTURING CO.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
UAW,
INTERVENOR

Consolidated with 11-1322

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

*Kerry P. Hastings* argued the cause and filed the briefs
for petitioner.

*David Seid*, Attorney, National Labor Relations Board,
argued the cause for respondent. With him on the brief were

*John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Ruth E. Burdick*, Supervisory Attorney.

*James B. Coppess* argued the cause for intervenor. With him on the brief were *Michael Nicholson* and *William J. Karges*. *Blair K. Simmons* entered an appearance.

Before: HENDERSON, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: Once again, we confront the issue of how much information a company must provide to a union during collective bargaining. Here, the company sought substantial wage concessions on the basis of competitive pressures it claimed to be facing. Seeking to verify this contention, the union requested information about the company's prices and customers. The company denied the union's request and then locked out the bargaining unit employees. Relying on a line of decisions endorsing a broad discovery standard, the National Labor Relations Board found that the union's information request was relevant to its duties as the employees' bargaining representative and that the company's information withholding and lockout were both unlawful. For the reasons given below, we deny the company's petition for review and grant the Board's cross-application for enforcement.

**I.**

Petitioner KLB Industries manufactures aluminum extrusions at its Bellefontaine, Ohio, facility. Since taking

over the plant in 1997, KLB has signed three collective bargaining agreements with its sixteen-member union. On September 20, 2007, ten days before the third agreement expired, the parties began negotiating a fourth agreement.

From the outset, KLB and the union took dramatically different positions. The company's position "centered around competitiveness." *KLB Industries*, 357 NLRB No. 8, 4 n.9 (July 26, 2011). Specifically, it claimed that it was facing increased competition from Asian manufacturers, rising production costs, and decreased productivity. KLB also expressed concern about retaining customers. Based on these claims, the company initially demanded substantial wage concessions: a twenty percent reduction in the first year and no changes the following two years. By contrast, the union sought wage increases. Throughout late September, the negotiations focused on wages and health insurance, and the parties agreed to a day-to-day extension of the expiring collective bargaining agreement.

On October 3, KLB notified the union that it would terminate the collective bargaining agreement on October 7. That same day the company made its last and final offer, which included an eight percent wage reduction the first year and two percent reductions in the second and third years. The union countered with moderate wage increases. Even though the federal mediator remarked that an impasse had been reached, the parties continued negotiating.

The next day, on October 4, the union sent KLB a letter requesting the following information: (1) a list of all current customers; (2) a copy of all price quotes that the company had provided over the past five years and an indication of which of those quotes had been awarded; (3) a list of all projects outsourced over the past five years that had been handled by

bargaining unit employees; (4) a list of all customers who had ceased purchasing from KLB during the last five years; (5) a complete list of prices for KLB's products; (6) market studies concerning the company's products; and (7) a complete calculation of KLB's projected savings from its concessionary wage proposal, including an estimate of overtime. The union explained that it needed this information because, "[d]uring the course of the[] negotiations, [KLB] has continually asserted that they must improve the competitive position of the Bellefontaine, Ohio facility." According to the letter, the union needed the requested information generally to verify KLB's competitiveness claim and the price information specifically to "compare the prices of competitors." Similarly, the union requested the list of lost customers to "test the Company's assertion that they are not competitive." Throughout early and mid-October, the parties continued negotiating and the wage issue remained a major sticking point.

On October 18, KLB responded to the information request, refusing to hand over information because its "desire to remain competitive in both global and domestic markets is no different from the desire of any business conducting operations similar to [this company]." KLB nonetheless disclosed estimated annual wage savings—one of the types of information the union had sought—without providing its underlying calculations or a prediction of overtime hours. The next day, KLB informed the union that a lockout would begin on October 22. KLB also informed the employees that their health insurance benefits would expire and that they would need to apply for COBRA benefits to continue receiving health insurance. Shortly thereafter, on October 21, the union responded to KLB's information disclosure, stating that it was insufficient to address the company's proposed wage cuts.

As announced, KLB locked out unit employees on October 22 and subsequently hired replacement workers. Two incidents relevant to this case occurred during the lockout. First, after KLB terminated the bargaining unit's health insurance, it discovered that the cancellation of the entire plan meant that unit employees were ineligible for COBRA benefits. Second, several months into the lockout, the company called the police to report that union employees had trespassed on company property when they placed picket signs on a public right of way.

The union filed unfair labor charges against KLB and at a hearing before an administrative law judge, the company continued to press its competitive disadvantage argument. In his opening statement, the company's attorney explained that "KLB was faced, in the 2007 negotiations, with business conditions it had not faced in previous years. KLB faced increased competition from Asia." The attorney also stated that the company "had suffered a customer setback that ended up costing it approximately a million dollars." To support these claims, KLB introduced into evidence a "Top 20 Customer Sales" chart detailing the past three years of sales. The ALJ found that the reasons offered by KLB at the hearing mirrored those offered at the negotiating table.

The ALJ concluded that because KLB had invoked competitive pressures as its key rationale in seeking wage concessions, the union was entitled to the requested information to verify those assertions. Rejecting the company's alternative arguments that its wage information disclosure was sufficient and that the union had requested information in bad faith, the ALJ concluded that the company's information withholding violated sections 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1) & (5). The ALJ also found that the lockout and

cancellation of health insurance violated sections 8(a)(1), (3), and (5). The ALJ, however, dismissed the union's allegation that the company had engaged in so-called surface bargaining—that it had bargained in bad faith. Finally, the ALJ found that the company had committed an unfair labor practice by calling the police in retaliation for the union's legal picketing. The Board, with one member dissenting, adopted the ALJ's factual findings, legal reasoning, and proposed order. The dissenting member disagreed with the Board's disclosure ruling and its conclusion that the lockout was unlawful, but agreed that KLB's cancellation of employees' health insurance violated section 8(a)(5).

KLB now petitions for review, challenging the Board's rulings on the disclosure issue, the lockout, and the health insurance cancellation. The Board moves for enforcement of its finding that KLB's call to the police violated the Act. "We must uphold the Board's decisions unless upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Pacific Micronesia Corp. v. NLRB*, 219 F.3d 661, 665 (D.C. Cir. 2000) (internal quotation marks omitted). We accord "due deference to the reasonable inferences that the Board draws from the evidence, regardless of whether the court might have reached a different conclusion *de novo*." *U.S. Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998) (internal citation omitted).

## II.

The core dispute in this case is whether the company's competitive disadvantage claim triggered an obligation to respond to the union's targeted request for information about customers and products. Our starting point is the Supreme Court's decision in *NLRB v. Truitt Manufacturing Co.*, 351

U.S. 149 (1956), where an employer claimed that it could not afford to pay higher wages but refused the union's request to supply information to verify that claim. The Court held that a "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." *Id.* at 153. If an "argument is important enough to present in the give and take of bargaining," the Court reasoned, "it is important enough to require some sort of proof of its accuracy." *Id.* at 152–53. In so ruling, however, the Court carefully acknowledged the limits of its decision:

> We do not hold . . . that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.

*Id.* at 153–54 (footnote omitted). *Truitt* thus stands for the proposition that failure to disclose relevant information can amount to an unfair labor practice under certain circumstances.

Following *Truitt*, the Board developed two lines of cases that apply the Court's fact-intensive standard. The parties disagree about which line of precedents controls this case.

The first requires an employer to "open its books" to the union if it "pleads poverty" or raises an "inability to pay" defense during collective bargaining negotiations. Until 1991, the Board treated "a plea of competitive disadvantage [as] the functional equivalent of a statement of inability to pay." *United Steelworkers of America v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993). But prompted by a series of Seventh Circuit

decisions, the Board changed course. *See, e.g.*, *NLRB v. Harvstone Manufacturing Corp.*, 785 F.2d 570 (7th Cir. 1986). In *Nielsen Lithographing Co.*, 305 NLRB 697 (1991), the Board expressly rejected its prior approach of treating competitive disadvantage claims as automatically triggering a broad disclosure obligation. Under *Nielsen*, "an employer's obligation to open its books does not arise unless the employer has predicated its bargaining stance on assertions about its inability to pay during the term of the bargaining agreement under negotiation." *Id.* at 700. In other words, a company's obligation to open its books is triggered when it claims an inability to pay, not when it is unwilling to pay. Furthermore, an employer's disclosure obligation under *Nielsen* is quite broad: a union is entitled to records sufficient to conduct a full financial audit. Employers that plead poverty must turn over "detailed financial information" such as "financial statements and tax returns for the past three years, the projected balance sheets and income statements . . . submitted to banks to obtain loans, and information concerning the salaries and perquisites of the company's managerial employees." *Graphic Communications International Union v. NLRB*, 977 F.2d 1168, 1169 (7th Cir. 1992).

We addressed the Board's *Nielsen* standard in *ConAgra, Inc. v. NLRB*, 117 F.3d 1435 (D.C. Cir. 1997). There, the employer conceded that it could afford to continue paying above-market wages, but insisted that competitive pressures required a wage reduction. Although the employer turned over information concerning its wages and pension plan, it refused to provide "financial statements, an additional two years' worth of information on sales to competitors, or any information regarding [the parent company's subsidiaries]." *Id.* at 1438. Ruling that the employer's competitiveness claim constituted a "plea of poverty," the Board found that the

company's refusal to furnish the requested information amounted to an unfair labor practice. We disagreed, stating that the Board's decision "represented an unacknowledged and unexplained departure" from *Nielsen*. *Id.* at 1436. Given the Board's previous change of position in *Nielsen*, we signaled that we would henceforth carefully scrutinize a finding that a company had pled poverty.

Running parallel to the *Nielsen* line of cases, a series of "discovery" decisions also applies *Truitt*'s holding that information withholding can constitute an unfair labor practice. These cases start with the premise that collective bargaining "includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). This Court, moreover, has "long adhered to the view that the Board is to apply a liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations." *U.S. Testing Co.*, 160 F.3d at 19. "Relevance is broadly construed, and in the absence of a countervailing interest, any requested information that has a bearing on the bargaining process must be disclosed." *Id.* Relevance is presumed if the information concerns the bargaining unit. But "the burden is on the union to demonstrate the relevance of information about nonunion employees." *Id.*

Significantly for the issue before us, the Board has applied its discovery line of cases to an employer's competitive disadvantage claim. For example, in *Caldwell Manufacturing Co.*, 346 NLRB 1159 (2006), the Board found that a company committed an unfair labor practice when it refused to turn over requested information concerning "material costs, labor costs, manufacturing overhead, productivity calculations, competitor data, and data on

possible new production." *Id.* at 1159 n.3. The Board observed that the union's "requests were made directly in response to specific factual assertions made by the [company] in the course of bargaining." *Id.* at 1160. Given this, the union was entitled to "request[] information to evaluate and verify the [company's] assertions and develop its own bargaining positions." *Id.* Distinguishing *Nielsen* and its progeny, the Board emphasized that the union did not seek "general access to the [company's] financial records," such as "the [company's] profits, net income, tax returns, salary information, or administrative expenses." *Id.* Rather, the union's information request in *Caldwell Manufacturing* was appropriate because it was tailored to the company's factual assertions. *See also A-1 Door and Building Solutions*, 356 NLRB No. 76, 4–5 (Jan. 11, 2011).

We distill these two lines of cases as follows. On the one hand, *Nielsen* stands for the proposition that a company pleading poverty must open its books for a full financial audit—a disclosure obligation that extends to a plethora of financial information. But as *Nielsen* also makes clear, a competitive disadvantage claim is insufficient, by itself, to obligate a company to open its books. On the other hand, the Board's discovery line of cases endorses a relevancy-based, pro-disclosure standard that allows a union to request specific information to verify a company's stated position, including competitiveness claims.

With these principles in mind, we turn to the Board's decision in this case. The Board found that KLB "repeatedly sought to justify its demands by stating that concessions were necessary to make its facility more competitive." *KLB Industries*, 357 NLRB No. 8, at 1. Undertaking a thorough explanation of the relevant precedents concerning when an employer is required to disclose information to a union and

analogizing this case to *Caldwell Manufacturing*, the Board evaluated the dispute under its discovery line of cases. The Board explained that by relying on competitive pressures as a justification for wage concessions, the company had made the veracity of that claim relevant to the negotiations. Accordingly, the union was entitled to the requested information to verify the company's assertions. As the Board pointed out, the Top 20 Customer Sales chart could have proven useful to the union in its effort to evaluate the competitive pressures facing KLB. Addressing the *Nielsen* line of cases, the Board concluded that "[t]his is not an inability-to-pay case," *id.* at 3, meaning that KLB had no obligation to open its books for a full financial audit. Responding to the dissenting member's argument that *Nielsen* controls, the Board explained that nothing in *Nielsen* implies that "a union faced with something less than an inability-to-pay claim is not entitled to *any* information." *Id.* Thus, harmonizing the two lines of cases, the Board concluded that "an information request . . . is not an all-or-nothing proposition." *Id.*

Challenging the Board's reasoning, KLB's central claim is that a "generalized competitiveness claim is insufficient to make the information at issue . . . relevant." Pet'r's Br. 14. According to KLB and our dissenting colleague, dissenting op. at 13–15, competitive disadvantage claims have a talismanic quality that requires the application of *Nielsen*'s framework. Given the Board's concession that this is not an inability-to-pay case, the company's argument goes, it has no disclosure obligation.

KLB's position ignores the Board's careful approach to its own precedent. Unlike in *ConAgra*, the Board distinguished *Nielsen* and justified its decision under the discovery line of cases. As found by the ALJ and affirmed by

the Board, record evidence establishes that KLB relied primarily on a competitiveness rationale in seeking substantial wage concessions. The union targeted its information request to that competitiveness claim and did not ask the company to open its books and provide generalized financial data concerning profits and management expenses. Thus, the union's information request and the company's concomitant disclosure obligation were narrow.

Nor does KLB offer a persuasive explanation for why a competitive disadvantage claim should be immunized from the Board's "liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations." *U.S. Testing Co.*, 160 F.3d at 19. It is true, as KLB emphasizes, that in a globalized economy the specter of competition haunts every company. But where, as here, an employer raises a competitiveness claim as its central justification for wage concessions, a union is entitled to information verifying that claim. Indeed, "a claim of pending competitive ruin generally requires some external verification before a union can reasonably rely upon it in deciding how to structure its negotiating strategy." *ConAgra*, 117 F.3d at 1449 (Wald, J., concurring). We therefore agree with the Board that *Caldwell Manufacturing* provides the appropriate framework for this case.

KLB alternatively argues that its competitiveness claim lacked the requisite specificity to trigger a disclosure obligation. The company points to language in *Caldwell Manufacturing* indicating that the employer there took the position during negotiations that its other facilities were more competitive. But KLB's competitiveness claim was also specific. The Board found that the company had made "grave, specific, and recurring assertions of [its] lack of competitiveness." *KLB Industries*, 357 NLRB No. 8, at 4. The

Board highlighted KLB's reliance on Asian competitors, rising production costs, and declining productivity. Although the company asserts, and the dissent agrees, dissenting op. at 9–13, that it made these claims at the administrative hearing rather than at the bargaining table, its representative testified that these concerns were relayed to the union during negotiations. Indeed, the testimony the dissent cites supports the Board's conclusion. KLB's negotiator testified that the company informed the union during negotiations that it needed to "stay competitive" because it was "competing with the Asian firms" and because "costs per hour, per production hour had risen, and . . . production, itself, had actually dropped a little." Thus, substantial record evidence supports the ALJ's finding that the issues raised at the administrative hearing were the same issues discussed at the bargaining table. *See KLB Industries*, 357 NLRB No. 8, at 4 n.9 (Board rejecting an identical argument and explaining that "the record makes clear that the [company] communicated these concerns not only at the hearing, but during negotiations as well"); *id.* at 50 (ALJ commenting that the company "defined or explained [its competitiveness claim] in a variety of ways" and finding that the reasons offered at the hearing mirrored those given at the bargaining table). *See also Pacific Micronesia Corp.*, 219 F.3d at 665 (explaining that the Board must "present on the record such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion" (internal quotation marks omitted)).

Moreover, and contrary to the dissent, dissenting op. at 8, the Board reasonably concluded that the company's competitive disadvantage claims could have been substantiated by examining price quotes, lost customers, and marketing strategies. As noted by the Board and invoked by union counsel at oral argument, the Top 20 Customer Sales chart could have demonstrated that KLB acquired a new

customer worth $1 million in revenue in 2006 only to lose that customer in 2007. Similarly, a list of prices could have helped the union with accomplishing its stated goal of "compar[ing] the prices of competitors." Not only was this information relevant to whether KLB faced an increasingly competitive business atmosphere, but the union's contemporaneously proffered reason for needing the information—double-checking the company's competitiveness claim—satisfies the "minimum standard of relevance" established by our precedent. *New York and Presbyterian Hospital v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011).

Of course, the specific information necessary to verify a competitiveness claim will vary depending on the circumstances of the case. By adopting a contextualized approach, *Caldwell Manufacturing* and its progeny are faithful to *Truitt*'s mandate that "[e]ach case must turn upon its particular facts." *Truitt*, 351 U.S. at 153. To the extent KLB now contends the dividing line between *Nielsen*'s "open your books" disclosure obligation and the instant information request is arbitrary and capricious, that argument is waived because it first appeared in the company's reply brief. *See Lake Carriers' Association v. EPA*, 652 F.3d 1, 10 n.9 (D.C. Cir. 2011) (noting that "arguments not raised until the reply brief are waived").

To be clear, we are sensitive to the risk that the *Caldwell Manufacturing* line of cases could become an end-run around *Nielsen*. But this case does not implicate that concern. Before this Court, KLB has pursued an all-or-nothing litigation strategy to disclosure. Relying on *Nielsen*, it argues that it had no disclosure obligation because it never pleaded poverty, and relying on *Caldwell Manufacturing*, it argues that its competitiveness claim was insufficiently specific to trigger a

disclosure obligation. As explained above, neither argument has merit. And critically for our purposes, the company does not argue here that even if it had a disclosure obligation, the union's information request was irrelevant. Given this, we have no need to demarcate the outer limits of the Board's discovery line of cases.

KLB makes two subsidiary arguments. First, it claims that it provided an adequate cost savings report for its wage concessionary plan. Recall that the union requested that KLB provide an estimate—with underlying calculations and overtime hours—of how much money its wage concessionary plan would save. Although the company provided annualized savings estimates, it failed to include the underlying calculations and the predicted overtime. Because a union is "entitled to inspect the data relied on by an employer and does not have to accept the employer's bald assertions or generalized figures at face value," *E.I. Du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1316 (D.C. Cir. 2007), KLB's argument is meritless.

Second, the company argues that the union made its information request in bad faith. According to KLB, the timing of the union's request—the day after the federal mediator's offhand remark about an impasse—reveals its pretextual nature. KLB further complains that the union made no mention of the information request until after the announcement of the lockout. But the federal mediator—not the company's representative—made the impasse remark, and the parties continued negotiating after that remark and after the union's information request. Moreover, the company only responded to the information request the day before the lockout announcement, which explains why the union remained silent for so long. Given this chronology and the importance of the wage issue to the negotiations, the Board

properly found that KLB failed to rebut the presumption of good faith bargaining. *See DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C. Cir. 2002) ("The Board presumes that requests for presumptively relevant information are made in good faith, until the company demonstrates otherwise.").

## III.

Having resolved the information withholding issue, we can quickly dispose of KLB's remaining arguments.

The company makes several interrelated contentions concerning the lawfulness of the lockout. We reject its first claim—that the information withholding was lawful and therefore the lockout was lawful—for the reasons stated above. KLB next asserts that the lockout was lawful because the Board dismissed the surface bargaining allegation. The company misinterprets the Board's reasoning. The information withholding made the lockout unlawful notwithstanding KLB's otherwise good faith bargaining. Thus, the Board's dismissal of the surface bargaining allegation is irrelevant. KLB claims that the Board failed to expressly find that the information withholding—and not another issue, like the health insurance dispute—materially affected the progress of the negotiations. The Board, however, adequately explained the nexus between the wage dispute and the information request:

> [The] proposed concessions were *the* central point of disagreement during negotiations . . . . The Union's information request was designed to enable the Union to evaluate and respond to that proposal. Absent the Union's willingness to buy "a pig in a poke," that information was therefore critical to the bargaining and the possibility of the parties' reaching an agreement . . . .

*KLB Industries*, 357 NLRB No. 8, at 6. Thus, contrary to the dissent, dissenting op. at 17–18, the Board did address whether the unlawful information withholding had a material effect on the progress of the negotiations.

Finally, given our conclusion that the lockout was unlawful, we have no need to discuss KLB's contention regarding the health insurance cancellation.

## IV.

The Board seeks enforcement of its finding that KLB unlawfully responded to the union's picketing by calling the police. Because the company failed to file exceptions to this finding, it is jurisdictionally barred from obtaining review in this Court. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

We deny KLB's petition for review and grant the Board's cross-application for enforcement of its Order.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting in part:

I respectfully dissent from Parts II and III of the majority opinion because, in my view, KLB Industries' (KLB) generalized statements regarding competitiveness did not give rise to a duty of further disclosure to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (Union), nor did KLB unlawfully impose the subsequent lock out of its bargaining unit employees.

## I.

KLB produces aluminum extrusions at its Bellefontaine, Ohio facility. KLB began negotiating with the Union for a new collective bargaining agreement (CBA) in September 2007.[1] KLB sought wage cuts and other concessions in order to improve its competitive position. On October 3, the parties met with a federal mediator. After KLB told the mediator that its current offer was its "last, best and final offer," the mediator stated "I guess we're at impasse then," to which the Union's representative demurred. *KLB Indus., Inc.*, 357 N.L.R.B. No. 8, at 24 (July 26, 2011). The next day, the Union sent KLB a letter requesting, among other things, information on KLB's proposal for "wage reductions." The Union wrote:

> During the course of these negotiations, the Company has continually asserted that they [sic] must improve the competitive position of the

---

[1] All dates are in 2007 unless otherwise noted.

Bellefontaine, Ohio facility. Based on this assertion, the Company has made numerous contract proposals that reduce the wages and benefits. In order for the Union to determine the veracity of these claims, please provide the following information:

1.  A list of all current customers so that the Union may contact the customers to determine if any of them is contemplating purchasing products from other sources.

2.  A copy of any and all quotes that the Company has provided, and whom these quotes have been issued to. Also, how many quotes have been awarded (or not awarded) in the past five (5) years.

3.  Identify any and all outsourced work (in the past 5 years) that had previously been done at this facility by the bargaining unit employees.[2]

4.  A list of all customers who have ceased buying from this facility during the last

---

[2] The 16-member bargaining unit was composed of "[a]ll hourly-paid production and maintenance employees in [KLB's] Bellefontaine, Ohio, plant but excluding all office and clerical employees, guards, professional employees and all supervisors." *KLB Indus.*, 357 N.L.R.B. No. 8, at 13 n.2.

5 years. The union needs this information to test the Company's assertion that they [sic] are not competitive. The union intends on contacting the former customers to learn the reasons why they stopped purchasing.

5. A complete list of prices for products so that the union can compare the prices of competitors.

6. In order for the Union to determine whether the company's assertion of uncompetitivness [sic] is based on price or other factors. Please provide market studies and/or marketing plans that would impact sales of products produced at of [sic] the KLB Industries, Bellefontaine, Ohio facility.

Deferred Appendix (DA) 357-58 (hereinafter referred to as "Competitive Information"). The Union also requested "a complete calculation of the projected company savings over the next three years, including any projected overtime" resulting from KLB's wage proposal. DA 358. The parties continued to negotiate but KLB did not provide the Competitive Information to the Union. On October 18, KLB wrote to the Union, explaining that the Competitive Information was irrelevant:

The Company disagrees that information you requested about its current customers is necessary and relevant . . . . The Company's desire to remain competitive in both global and domestic markets is no different from the desire of any business

> conducting operations similar to those of KLB. . . . [T]he UAW's bare assertion that it needs to test the veracity of KLB's "claim" of competitiveness is insufficient to make customer information necessary and relevant to the Union's role as the exclusive representative of the bargaining unit.
>
> The Company also disagrees that information about outsourced work is necessary and relevant to the UAW's representation of the bargaining unit. The UAW is well aware that KLB has, and continues to, outsource work. To KLB's knowledge, the Union has never complained about or grieved outsourcing. Further, the Company and the Union have not had any bargaining discussions related to outsourcing. The Company fails to understand how its broad statement of remaining competitive in global and domestic markets triggers the necessity and relevancy of outsourcing information.
>
> The Company, however, agrees that the wage cost saving is necessary and relevant. The first year saving[s] is $36,177.00. The second year savings is $44,498.00. The third year savings $62,652.00 [sic]. And the overall cost savings of the proposed wage decrease is $133,327.00.

DA 387. Three days later, the Union responded. Rather than explaining the relevance of its request for the Competitive Information, it simply repeated:

> The Union maintains that it is entitled to all documents and information called for in our October 4, 2007 letter and, again, the Company has failed miserable [sic] to supply essential information

regarding the Company's proposals to [sic] wage reductions to the Union.

DA 393. The Union also complained that the wage cost savings information did not include "complete calculations." DA 393. On October 19, KLB told the Union representative that a lockout would commence on October 22. KLB also sent letters to bargaining unit employees stating that insurance benefits would terminate on October 23 and that they should apply for continuation coverage, if desired, under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161 *et seq.* (COBRA). On October 22, KLB locked out the bargaining unit employees and began hiring temporary replacements. On October 24, KLB notified United Healthcare, its insurance provider, to cancel its group insurance policy. Unbeknownst to KLB, the cancellation meant that bargaining unit employees were not eligible for the COBRA continuation coverage. While the parties met thereafter on three other occasions, they did not come to an agreement on a new CBA.

Ultimately, the Union filed unfair labor practice charges[3] against KLB. After a hearing before an administrative law judge (ALJ), the ALJ found that KLB had violated the NLRA by (1) failing to provide relevant information to the Union;

---

[3] The unfair labor practices involved "bargaining violations, an unlawful lockout, . . . a unilateral change in terms and conditions related to the cessation of health benefits after the lockout commenced . . . [and] an allegation that the employer 'restrained and coerced' employees in the exercise of their Section 7 rights." *KLB Indus., Inc.*, 357 N.L.R.B. No. 8, at 60.

and (2) locking out employees, hiring temporary replacements and cancelling health insurance.[4] On July 26, 2011, the Board affirmed the ALJ's decision and reasoning in full, with Member Hayes dissenting on the grounds that KLB was under no obligation to provide the Competitive Information to the Union and that the lockout/hiring of temporary replacements was lawful. The Board found, *inter alia*, that KLB had violated section 8(a)(5) and (1) of the Act by failing to provide the Union relevant information and section 8(a)(5), (3) and (1) by locking out employees, hiring temporary replacements and cancelling its employees' health insurance coverage.

## II.

Applying clear precedent, I believe the Board incorrectly concluded that KLB violated section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5) (NLRA or Act), by declining to produce the Competitive Information. Under section 8(a)(5), the employer has a "duty to bargain collectively," *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979), which requires it to provide relevant information to the union when requested. *See N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011). Information about bargaining unit terms and conditions of employment is presumptively relevant. *See id.* at 730. But where, as here, the union requests information regarding a different matter, it has the burden to "explain to the employer

---

[4] The ALJ found, and KLB did not contest, the unfair labor practice resulting from its summoning the police to retaliate for the Union's picketing.

why the information is relevant." *Id.* The "threshold for relevance" is a "discovery-type standard," meaning "'[t]he fact that the information is of probable or potential relevance is sufficient to give rise to an obligation . . . to provide it.'" *Id.* (quoting *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 359 (D.C. Cir. 1983)) (internal quotation mark omitted and alterations in original). In determining whether the union has satisfied its burden to show relevance, we have held that "'context is everything,'" and, most important here, "we consider the reasons [for relevance] proffered by the union at the time of its request." *Id.* at 731 (quoting *U.S. Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998)).

While the "threshold for relevance" is low, it is not zero. "'A union's bare assertion that it needs information . . . does not automatically oblige the employer to supply all the information in the manner requested.'" *Id.* at 730 (quoting *Detroit Edison*, 440 U.S. at 314)) (ellipses in original). An employer must supply information to substantiate *specific* assertions on which it premises its bargaining positions because the information is necessary to the Union to "evaluate and verify the [employer's] assertions and develop its own bargaining positions." *Caldwell Mfg. Co.*, 346 N.L.R.B. 1159, 1160 (2006); *see also Lakeland Bus Lines v. NLRB*, 347 F.3d 955, 960 (D.C. Cir. 2003) ("Th[e] obligation to bargain in good faith requires that employers and unions exchange *relevant* information when *necessary to substantiate* assertions made during collective bargaining.") (emphases added). At the same time, the employer has no obligation to disclose information merely because it makes a generalized statement during negotiations. *See F.A. Bartlett Tree Expert Co.*, 316 N.L.R.B. 1312, 1313 (1995) (employer's reference to fact that customer contracts varied did not obligate employer to furnish contracts to union for examination).

An employer must provide general financial information to a union if the employer predicates its bargaining position on an "inability to pay." *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152-53 (1956). For a time, the Board also applied this formulation to an employer that asserted competitive disadvantage, treating the assertion as the equivalent of an inability to pay claim. *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1439 (D.C. Cir. 1997). As discussed in *ConAgra*, however, the Seventh Circuit first registered its disagreement with the Board's formulation in 1986. In *NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570 (7th Cir. 1986), that Circuit declared that claims of competitive disadvantage are "nothing more than truisms" and do not equate to an inability to pay. *Id.* at 576-77. Instead, a competitive disadvantage claim manifests only that the employer is not *willing* to pay—which, unlike an inability-to-pay claim, is not a verifiable assertion—and consequently does not require substantiation. *See id.* at 577 ("[T]he employer operating at a competitive disadvantage is financially able, although perhaps unwilling, to pay increased wages."); *see also Lakeland Bus Lines*, 347 F.3d at 961 ("a mere unwillingness to pay . . . does not [trigger a duty to disclose]"); *United Steelworkers of Am., Local Union 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993) ("A company is obliged to provide financial information only when it asserts an inability to pay, because this assertion is legitimately subject to verification."). The Board eventually agreed, concluding in *Nielsen Lithographing Co.* that a "claim of competitive disadvantage is not the same as a claim of financial inability to pay" and therefore does "not trigger an obligation to furnish financial information under *Truitt*." 305 N.L.R.B. 697, 699, 701 (1991).

"We review the Board's factual conclusions for substantial evidence" and "uphold the Board's application of law to facts unless arbitrary or otherwise erroneous." *N.Y. &*

*Presbyterian Hosp.*, 649 F.3d at 729 (quoting *Guard Publ'g Co. v. NLRB*, 571 F.3d 53, 58 (D.C. Cir. 2009)) (internal quotation marks omitted). Here, however, the Board wholly failed the substantial evidence test. It concluded that KLB made "grave, specific, and recurring" representations about competitiveness, which "encompassed not only the source of competitive difficulties (rising production costs and falling production), but the day-to-day impact of those constraints on the company's business, including its difficulty in retaining customers and in paying employees in line with previous contracts." *KLB Indus., Inc.*, 357 N.L.R.B. No. 8, at 4. The Board also declared that KLB had "explicit concerns about retaining customers and keeping pace with Asian competitors" and that KLB's concerns were communicated "not only at the hearing, *but during negotiations as well.*" *Id.* n.9 (emphasis added). Unless I have read a different version of the Board decision, the Board *nowhere* pointed to *any* evidence that matches its overblown description of KLB's negotiating posture.[5]

Simply put, the record does not support the Board's characterization of the parties' bargaining. As Member Hayes explained in dissent, the *only* record evidence regarding KLB's "elaboration" of its competitive disadvantage assertion is as follows:

---

[5] KLB's post-bargaining testimony at the hearing before the ALJ does not bear on the relevance determination; relevance must be demonstrated by the Union at the time it makes its request. *N.Y. & Presbyterian Hosp.*, 649 F.3d at 731.

Q. (on direct examination) Did KLB say anything to the Union regarding why it wanted to achieve cost savings in this Collective Bargaining Agreement in 2007?

A. We indicated to them that we, you know, wanted to be—stay competitive and we were competing with the Asian firms.

And also that our *costs per hour*, *per production hour had risen* and our—*our production, itself, had actually dropped a little*.

Q. Okay. And did KLB, during the 2007 negotiations, did KLB tell the Union about the—the top 20 information [about customers] that we just discussed with the Court?

A. No, we did not.

DA 167:10-23 (Testimony of KLB Negotiator Bryan Hastings) (emphasis added).

Q. (on direct examination) Do—do you—did the Employer offer any explanation at this point as to why they needed all of these wage cuts?

A. *They always only referred to competitiveness*.

Q. Okay. And—and who is that, that you say that's speaking?

A. I would say Brian [sic].

Q. So when you say referred to competitiveness so that the Employer could be competitive?

A. Yes.

DA 47:4-8 (Testimony of Union Negotiator Konrad Young) (emphasis added).

> Q. (on cross-examination) With respect to explaining why the Company wanted concessions, isn't it true that Mr. Hastings said more that [sic] just they needed to be competitive?
>
> A. *I don't recollect anything other than competition with other Companies without them naming the Companies and it all centered around competitiveness.*
>
> Q. Okay. Did Mr., Mr. Wakefield told [sic] you that the Company's production cost was decreasing, isn't that true?
>
> A. Competitive, yes, that's competitiveness.
>
> Q. All right. And Mr. Wakefield also told you that the productivity of the Company's employees was decreasing, isn't that correct?
>
> A. I don't recall that.

DA 76 at Tr. 369:24-370:13 (Testimony of Union Negotiator Konrad Young) (emphasis added). The record shows, at best, two substantiatable "competitiveness" statements: Hastings's statement about a rise in "production cost[s]" and Hastings's statement about decreased productivity. But the Union did not specify any "production costs" or "productivity" information in the lengthy list of Competitive Information it *did* seek. Additionally, KLB's statement regarding competition from "Asian firms" was generic. Hastings did not name specific

competitors—he simply mentioned "Asian firms," common competitors of nearly all American manufacturers.

Additionally, the generality of the Union's Competitive Information request manifests that KLB in fact made only a generic competitive disadvantage claim in that both the Union's initial request of October 4 as well as its October 21 follow-up letter failed to refer to even a single "competitiveness" claim made by KLB during negotiations. Despite having the burden to explain the relevance of the Competitive Information it sought at the time it sought that information, *see N.Y. & Presbyterian Hosp.*, 649 F.3d at 731, the Union merely stated that it wanted the Competitive Information to establish the "veracity" of KLB's competitive disadvantage claim. This is plainly insufficient to establish relevance. *Cf. F.A. Bartlett Tree Expert Co.*, 316 N.L.R.B. at 1313 ("The basis for the request, i.e., that the information contained in the [customer] contracts is necessary to make a reasonable wage proposal is nothing more than another way of saying that it is needed 'to bargain intelligently' and this general claim is simply insufficient to establish relevance."). Moreover, after KLB replied that the Competitive Information was irrelevant, *see* DA 387, the Union reasserted with no elaboration that it was entitled to the Competitive Information and chastised KLB for failing "miserabl[y] to supply" the information. DA 393.

The majority gives several reasons why it believes "substantial record evidence supports the ALJ's finding that the issues raised at the administrative hearing were the same issues discussed at the bargaining table." Maj. Op. 13. But the *only* record evidence it cites is Hastings's admission that he made a generic competitive disadvantage claim during bargaining. I do not see how it follows from this that KLB made the required *specific* claims during bargaining. The

majority also cites the Board's statement that KLB "'communicated [its] concerns not only at the hearing, but during negotiations as well'" and that the ALJ stated that KLB explained its competitive disadvantage claim "'in a variety of ways'" and that KLB's rationale for wage cuts "'centered around competitiveness.'" Maj. Op. 3, 13 (quoting *KLB Indus., Inc.*, 357 N.L.R.B. No. 8, at 4 n.9, 50). But these statements are not supported by *any* record evidence.[6] The majority fails to address the key weakness of the Board's order: that it is not supported by substantial evidence.

The majority compares the specificity of KLB's competitiveness claim to that of the employer in *Caldwell*. But in *Caldwell*, the employer specified that: (1) its Rochester plant was less competitive than its other plants; (2) that plant had already experienced significant reductions in force; (3) its production costs were lower elsewhere; and (4) without bargaining concessions, the Rochester plant would not be "a viable option when it came time to locate contemplated new product lines." 346 N.L.R.B. at 1160 & n.6. And, in response to the employer's detailed assertions, the union "requested *specific* information to evaluate the accuracy of the [employer's] *specific* claims." *Id.* at 1160 (emphases added);

---

[6] The majority also claims the ALJ found that KLB's "reasons offered at the hearing mirrored those given at the bargaining table." Maj. Op. 13. I do not read the ALJ to have made that finding; rather, the ALJ did not distinguish between KLB's reasons given at the hearing and those given during negotiations. *See KLB Indus., Inc.*, 357 N.L.R.B. No. 8, at 50 (after stating KLB explained its competitive disadvantage claim "in a variety of ways," ALJ referred to explanations given only "[a]t the hearing").

*see also id.* at 1159 & n.3, 1160 n.6. KLB's bargaining position—which generically referred to production costs, productivity and "competing with the Asian firms"—is a far cry from the employer's position in *Caldwell*—even more so because the Union failed to request *any* information regarding production costs and productivity.

The majority divides the duty to disclose non-presumptively-relevant information (*i.e.*, information that does not relate to bargaining unit terms and conditions of employment) into two distinct "lines of cases." Maj. Op. 7. The "discovery" line of cases stands for the proposition that the employer must turn over all requested information that is relevant to the union, with relevance being "'broadly construed.'" Maj. Op. 9 (quoting *U.S. Testing Co.*, 160 F.3d at 19); *see also supra* pp. 6-7 (discussing *N.Y. & Presbyterian Hosp.*, 649 F.3d at 730, as requiring information to be only "of probable or potential relevance"). On the other hand, the "*Nielsen*" line is more specific—it requires the employer to "'open its books' to the union if it 'pleads poverty' or raises an 'inability to pay' defense during . . . negotiations," Maj. Op. 7-8, but not if the employer claims competitive disadvantage. *See Lakeland Bus Lines*, 347 F.3d at 961. The majority contends that this case belongs in the broad discovery line. I disagree.

The *Nielsen* line of cases is not wholly analytically distinct from the discovery line; rather, the *Nielsen* line is a *specific* line of authority that branches from the discovery precedent. Under *Nielsen*, the *reason* the employer's books become relevant when it pleads poverty is that an examination of the books can verify if the employer's assertion is true. *United Steelworkers*, 983 F.2d at 244 (emphasis added) ("A company is obliged to provide financial information only when it asserts an inability to pay, *because this assertion is*

*legitimately subject to verification.*") (emphasis added). But the *Nielsen* line also explains that the employer's assertion of competitive *disadvantage* (as opposed to a poverty plea) does *not* create a broad disclosure obligation because the assertion is not "legitimately subject to verification." *See id.*; *Lakeland Bus Lines*, 347 F.3d at 961. Just as in the analogous area of statutory construction, where the specific controls the general, *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls over one of more general application"), the employer asserting competitive disadvantage represents a "carve out" from the otherwise applicable broad discovery cases.

My colleagues conclude that "KLB has pursued an all-or-nothing litigation strategy to disclosure" and "critically for our purposes, the company does not argue here that even if it had a disclosure obligation, the union's information request was irrelevant." Maj. Op. 14-15. I disagree; KLB did not pursue an all-or-nothing disclosure strategy, either during bargaining or litigation. In response to the Union's October 4 Competitive Information request, KLB *in fact* provided information it agreed was relevant. *See* DA 387 (providing bonus proposal information and wage cost savings information). Presumably KLB would have provided further information had the Union fulfilled its burden to explain the information's relevance. *N.Y. & Presbyterian Hosp.*, 649 F.3d at 731.[7] Nor does KLB take the position today that it had no

---

[7] I note that KLB's hesitation in turning over Items 1, 4 and 5 of the Competitive Information was undoubtedly reasonable. The Union requested KLB's current customer list "so that the Union may contact the customers to determine if any of them is contemplating purchasing products from other sources," KLB's

obligation to disclose any information contained in the October 4 request only because it did not make a plea of poverty; rather, KLB also asserts that it did not have an obligation to disclose irrelevant information.

Although broad, the relevance standard is not meaningless. Nothing in the record of the parties' negotiations demonstrates that KLB made anything other than a generic competitive disadvantage claim; a mere "truism" indicating an *unwillingness* to pay. Likewise, nothing manifests that the Union met its burden by demonstrating the relevance of the Competitive Information at the time it sought that information.[8]

---

former customer list because it "intends on contacting the former customers to learn the reasons why they stopped purchasing" and KLB's "complete list of prices for [its aluminum extrusion] products so that the [U]nion can compare the prices of competitors." DA 357-58. Even were the Union simply to approach KLB's current and former customers about their purchasing practices, that could well disrupt KLB's business relationship, including goodwill, with them. Nor would customers be likely to appreciate KLB's decision to divulge their contact information as a bargaining chip. KLB simply exercised good business sense in insisting on knowing the relevance of the requests before revealing sensitive information.

[8] I do agree with my colleagues, however, that KLB failed to provide the Union with an adequate cost savings report for its wage plan. *See infra* p. 18.

**III.**

I also believe that KLB's lockout, hiring of temporary replacements and cancellation of health insurance did not violate sections 8(a)(5), (3) and (1) of the Act.

A bargaining lockout is lawful if it is initiated for the "sole purpose of bringing economic pressure to bear in support of [an employer's] legitimate bargaining position." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965). On the other hand, an employer may not lock out employees "for the purpose of evading its duty to negotiate with the employees' bargaining representative." *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991). But "the mere fact of an unremedied Section 8(a)(5) failure to furnish information does not necessarily *compel* a finding that a subsequent lockout was unlawful." *PACCAR, Inc. d/b/a Peterbilt Motors Co.*, 357 N.L.R.B. No. 13, at 4 (2011) (emphasis in original). Rather, "[a]lthough nowhere expressly stated, the standard consistently, if implicitly, applied by the Board is that where the unlawful withholding of the information did not *materially affect the progress of negotiations*, the . . . lockout is lawful notwithstanding the unremedied violation." *Id.* (emphasis added). While *Peterbilt Motors* involved a *post*-lockout refusal to furnish requested information, the Board there noted that the standard applies whether the refusal is pre- or post-lockout. *Id.*

Here, the Board found the lockout unlawful because KLB failed to provide the Competitive Information and additional calculations in support of its projected wage cost savings. The Board conducted no analysis either of the purpose of the lockout or of the material effect—if any—of KLB's failure to disclose on the progress of negotiations. Instead, the Board found the lockout was "tainted" because the issue of wages

was "critical to the bargaining" and the information KLB failed to turn over was related to the proposed wage cuts and the reasons therefor. DA 425-26. But the Board failed to address the fact that the parties were nearly at impasse *before* the Union's information request or the fact that negotiations continued *after* KLB declined the information request. Nor does the Board conclude that disclosure would have made a material difference to the progress of negotiations.

The Board's finding that the lockout was unlawful is particularly problematic because, given the fact that KLB had no duty to disclose the Competitive Information, the *only* relevant information that KLB failed to provide were calculations supporting KLB's wage cost savings information. The record, however, does not support the notion that the failure to provide the calculations materially affected the progress of bargaining or manifested that KLB was attempting to evade its bargaining duty. Accordingly, I find KLB's lockout lawful. Additionally, because it is undisputed that KLB could lawfully hire temporary replacements if the lockout was lawful, I find its decision to do so lawful as well.[9]

---

[9] Because I believe the lockout was lawful, I would also reach the issue of the cancelled health insurance. The Board found that KLB's cancellation of its group health insurance plan was unlawful because it was a unilateral change in the terms and conditions of employment. *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001) ("An employer violates th[e] duty to bargain if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment.").

The relevant CBA provision states that health insurance benefits may be terminated "*no later than* the end of the month following the month in which an employee is laid off or is off work for any

For the foregoing reasons, I respectfully dissent. I would grant KLB's petition for review in large part, concluding that KLB lawfully declined to provide the Competitive Information (with the exception of the supporting wage cost savings calculations), lawfully locked out employees and hired temporary replacements and lawfully discontinued health insurance for its locked-out employees. I would deny the Board's cross application for enforcement except as otherwise hereinabove noted. *See supra* pp. 6 n.4, 15-16 n.7, 18.

---

reason other than circumstances which expressly give rise to insurance benefits hereunder." DA 462 (emphasis added). In other words, health insurance benefits last *no later* than "the end of the month following the month" after an employee is "off work for any reason" (*e.g.*, locked out). Without explanation, the Board found that this language guaranteed KLB employees coverage until "the end of the month following the month" after being locked out. But the CBA provides "no *later* than," not "no earlier than." The Board failed to point to any other CBA provision to the contrary. *See also Sherwin-Williams Co.*, 269 N.L.R.B. 678, 678 (1984) (employer lawfully declined to pay health insurance premiums for striking employees under CBA provision that required employer to pay monthly health insurance premiums only for employees "in active service").

Nor do COBRA rights change the analysis. While KLB's decision to terminate its plan deprived employees of potential health insurance continuation coverage under COBRA, COBRA provides that continuation coverage is not required for a plan that normally employs "fewer than 20 employees on a typical business day." 29 U.S.C. § 1161(b). KLB's health plan covered only sixteen employees.